United States District Court

For the Northern District of California

1

2

3

4

5               IN THE UNITED STATES DISTRICT COURT

6           FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   K.F. and C. Oluka,                      No. C 05-1222 CW

9            Plaintiffs,                     ORDER DENYING
                                             DEFENDANTS'
10       v.                                  MOTIONS FOR
                                             SUMMARY JUDGMENT
11   GUARDSMARK, LLC, SHERMAN FORD and
     DOES 1 through 10, inclusive,
12
             Defendants.
13
     _____/
14

15

16       Defendant Guardsmark, LLC moves for summary adjudication of

     Plaintiff Chuks Oluka's claims against it.[1]  Defendant Sherman Ford
17
     separately moves for summary adjudication of Plaintiff's claims
18
     against him.  Plaintiff opposes the motions with respect to his
19
     claims for retaliation and disability discrimination, but not his
20
     claim for defamation.  The matters were taken under submission on
21
     the papers.  Having considered the papers filed by the parties, the
22
     Court GRANTS Defendants' motions for summary adjudication of
23
     Plaintiff's defamation claim, but otherwise DENIES the motions for
24
     summary adjudication.
25

26
     _____
27
         [1]Former plaintiff K.F. has reached a settlement with
28   Defendants, and her claims against them have been dismissed.  See
     July 7, 2006 Stipulation and Order for Dismissal.

United States District Court

For the Northern District of California

BACKGROUND

Unless otherwise noted, the facts below are either undisputed or refer to the evidence submitted by Plaintiff in support of his opposition to Defendants' motions.

Plaintiff's claims arise out of his employment as a security guard with Guardsmark, a company that provides private security services to business clients.  In November or December of 2002, Plaintiff, who is originally from Nigeria, began working part time as a guard at a site at 560 Mission Street, working a day shift. Levy Decl., Ex. I, Oluka Dep. 67:25-68:2, 80:5-11.  At that time, former plaintiff K.F., a refugee from Liberia, also worked at the 560 Mission Street site.  Mr. Ford was the "site manager" at the 560 Mission Street site.

According to Plaintiff, another co-worker, Jonathan Low, was spreading rumors about "sexual activities" between K.F. and Mr. Ford, and suggesting that African-American Guardsmark employees, including K.F. and Plaintiff, had gotten their jobs because they were black, or, in the case of females, because they were having sex with Mr. Ford.  Oluka Dep. 190:1-4.  On February 10, 2003, in response to these rumors, Plaintiff wrote a letter addressed to "The Account Manager," as well as Mr. Ford and Leroy Hawkins, stating, in part,

> I would like to bring to your attention, the tension that is currently building amongst us, the security officers working at the loading dock of 560 Mission Street, San Francisco, CA. The situation is generated by claims and allegations of racism, sexism, discrimination and favoritism against management by Jonathan Lo.  The continued spread of these unsubstantiated allegations is creating a disruptive and hostile environment for us as we perform our duties.

2

Oluka Decl., Ex. B, Feb. 10, 2003 Letter To Guardsmark Account

Manager from Chuks Oluka.

After K.F. saw a copy of the letter, she explained to

Plaintiff that she was having sexual relations with Mr. Ford, but

that the relationship was not consensual.  Levy Decl., Ex. E, K.F.

Dep. 168:12-18.  Plaintiff urged her to report this, but K.F.

responded that she could not, because Mr. Ford had threatened that

"he would make me lose my job and be deported."  K.F. Decl. ¶ 6.

Plaintiff tried talking to K.F. and checking on her to see if she

would talk to someone, but she would not.  K.F. Dep. 178:17-19.

K.F. begged Plaintiff not to tell anyone about it.  Id. 178:21-22.

Mr. Ford started to ask K.F. "what Mr. Oluka knew about what Mr.

Ford was doing to me," so she warned Plaintiff "to be careful."

K.F. Decl. ¶ 7.

In June, 2003, at a work party, Plaintiff saw K.F. and another

female Guardsmark employee walking away from Mr. Ford; K.F. later

explained that Mr. Ford had been seeking sexual favors.  Oluka Dep.

152:18-153:7.  Plaintiff told Emily Fan, the manager of

Guardsmark's San Francisco branch office, that he would like to

talk to her "about things going on before they got out of hand."

Id. 156:12-15.  Ms. Fan did not ask what Plaintiff meant, but said

that she would make arrangements to talk to him later.  Id. 158:5-

12.  Plaintiff never heard from Ms. Fan.  Id. 158:13-16.  The other

female employee stopped working for Guardsmark two weeks after the

party, and K.F. subsequently told Plaintiff that she hadn't been

bothered by Mr. Ford since the party, so Plaintiff decided it was

not necessary to pursue the issue.  Id. 159:9-16.

3

In June, 2003, Plaintiff began to experience difficulty sleeping. Oluka Dep. 105:23-25. At that time, he was working the 10:00 p.m. to 6:00 a.m. graveyard shift and attending about one day of classes per week. Id. 106:8-16. He would stay awake for hours, and couldn't sleep in the day or night. Id. 106:3-4. Plaintiff asked for a transfer to the day or swing shift "just about every week," explaining that "every time there was an opening or I saw, I heard rumors of an opening," he spoke with Mr. Velasquez or Yasir Basheer. Id. 99:4-11. Plaintiff did not receive a shift change, even though priority was usually give to people already working on a site who wished to switch to the day shift. Velasquez Dep. 85:20-24. Both Jim Velasquez, a supervisor, and his successor David Garcia, informed Plaintiff that it was Mr. Ford who refused to grant Plaintiff's transfer out of the graveyard shift. Oluka Decl. ¶ 4; Oluka Dep. 122-23. Similarly, Plaintiff asked the 560 Mission Street Account Manager, Luis Estrera, why his requests for shift changes had not been granted despite many openings and many swing shift vacancies filled, and Mr. Estrera told him that it had to do with Mr. Ford. Oluka Dep. 122:15-22. In November, 2003, Plaintiff informed Mr. Estrera that he would like to change shifts in order to sleep better; Mr. Estrera referred Plaintiff back to Mr. Ford. Oluka Dep. 120:13-21.

In October, 2003, Sara Mendoza replaced Mr. Basheer as Plaintiff's shift supervisor. Oluka Dep. 99:19-24. Ms. Mendoza also testified that she was told by Mr. Velasquez that all requests by Plaintiff were to go to Mr. Ford; similarly specific instructions were not given with respect to any other employee.

4

United States District Court

For the Northern District of California

Mendoza Dep. 142:13-19.  When asked if she thought this was unusual, Ms. Mendoza responded, "I kind of questioned it, but I didn't say anything."  Id. 143:2-3.  Ms. Mendoza was not aware of any employee, other than Plaintiff, whose requests for a shift change were not granted.  Id. 134:12-15.

In December, 2003, while K.F.'s boyfriend was out of town, Mr. Ford again began approaching her and pressuring her inappropriately.  K.F. Decl. ¶ 10.  K.F. told Plaintiff about Mr. Ford's renewed, unwanted attention.  Id.  She again warned Plaintiff to be careful, explaining that "Mr. Ford has been asking a lot of questions" about Plaintiff, and that the supervisor had "a lot of ears and agents who report" on their conversations.  Oluka Dep. 164:17-25, 165:4-14.  According to K.F., Mr. Ford asked her what Plaintiff knew about Mr. Ford's misconduct, but she was "evasive" in her responses.[2]  K.F. Decl. ¶ 11.

About two days after his December conversation with K.F., Plaintiff again contacted Ms. Fan.  He reminded her of his June, 2003 request for a meeting, and asked to speak with her in person, off the premises, explaining that he needed to talk to her "ASAP before these things escalated."  Oluka Dep. 170:4-10.  Although Plaintiff said he wanted to meet sooner, Ms. Fan indicated that the

_____

[2]Defendants object to this and other portions of K.F.'s and Plaintiff's declarations on grounds including relevance and hearsay.  Testimony about what Mr. Ford or others said is admissible not to prove the truth of the matters asserted therein, but as evidence of knowledge and intent.

Otherwise, to the extent the Court relies upon Plaintiff's evidence, Defendant's objections to it are overruled.  To the extent the Court does not rely on that evidence, Defendant's objections are denied as moot.

earliest she could meet was January 2, 2004.  <u>Id.</u> 171:16-23.

On December 30 or 31, Ms. Mendoza brought a disciplinary report against Plaintiff.  <u>Id.</u> 251.  According to Plaintiff, she explained that Mr. Ford had asked her to give the report to Plaintiff, and that she was being "forced to take a disciplinary action against me that she knows was not correct."  <u>Id.</u> 251:17-252:15.  According to the disciplinary report, dated December 29, 2006, Plaintiff was disciplined because,

> For the month of December on different dates Tuesday December 2, 2003, Thursday December 18, 03, Friday December 26, 03 and Saturday December 27, 03 you were scheduled to work grave shift and failed to show up for work stating that you were sick.  Because of your failure to show up for work the company fell short in manpower and had to pay for overtime to cover your shift.  If this occurres [sic] one more time during a 30 day period you will be suspended and or terminated from this site.
> This type of conduct/inefficiency will not be tolerated by Guardsmark.  Further actions of this nature by you will result in your removal from this account and possible immediate termination.

Oluka Decl., Ex. C, Employee Disciplinary Rep. (capitalization omitted).  Plaintiff testifies that at least one of the dates mentioned in the report was a day he was not even scheduled to work, and that on the other days, he was sick due to lack of sleep and notified Guardsmark ahead of time of his inability to work.  Oluka Dep. 241:11-24.  On January 4, 2004, Plaintiff wrote a letter of protest to Mr. Ford, stating that he felt that the disciplinary report was a "case of 'giving a dog a bad name in order to hang it.'"  Oluka Decl., Ex. D, Jan. 4, 2004 Letter from Plaintiff to Mr. Ford.  He also complained that, despite six months of requests, he had been denied a transfer to the swing shift, resulting in sleeping problems, including "instances when I could not sleep for

6

United States District Court

For the Northern District of California

up to 48 hours."  Plaintiff did not receive a response to his letter.  Oluka Decl. ¶ 7.  During this litigation, Defendants subpoenaed Plaintiff's medical records from the office of his physician, Dr. Jim Savage, who produced a Certificate of No Records.  Leader Supp. Decl., Ex. A, Certificate of No Records.  Plaintiff's sleep disturbance ended when his employment status changed later in January.  Oluka Dep. 119:5-8.

Plaintiff's meeting with Ms. Fan was moved to January 9, 2004.  According to a later February 6, 2004 report to Guardsmark corporate headquarters, Plaintiff informed her at the meeting that Mr. Ford had "used his position to coerce [K.F.] into having sex with him."  Levy Decl., Ex. A.  Ms. Fan testified that she understood that Plaintiff was reporting that Mr. Ford had raped K.F.  Fan Dep. 134:4-7.  After her meeting with Plaintiff, Ms. Fan told Mr. Ford that she had received a "allegation of sexual harassment" against him.  Id. 81:15-15-25.  She asked him if the allegations were true, and he denied them.  Id. 82:1-8.  Ms. Fan states that she "may" have disclosed K.F. as one of the women Mr. Ford was alleged to have harassed.  Id. 82:3-5.  It didn't occur to Ms. Fan to remove Mr. Ford from the site pending an investigation.  Id. 83:3-10.

Ms. Fan interviewed several women in a conference room, on the same floor as Mr. Ford's cubicle; she did not think about whether it might make some of them uncomfortable to speak freely in close proximity to Mr. Ford.  Id. 89:4-15.  K.F. explains that she did not report Mr. Ford's sexual assaults to Ms. Fan because she was afraid.  Id. 63:10-12.  According to K.F.,

7

> Mr. Ford called me prior to the interview with Ms. Fan, he asked me if I was the one who had complained. He made it clear that I was not to tell her anything. He also asked me to tell Ms. Fan that Mr. Oluka was trying to cause problems and that Mr. Oluka and I had a romantic relationship.

K.F. Decl. ¶ 12. All of the women Ms. Fan questioned denied being sexually harassed or sexually assaulted by Mr. Ford.

On about January 20, 2004, Ms. Fan told Mr. Ford that he had been exonerated. Ford Dep. 172:11-16. On January 21, Mr. Ford asked Plaintiff if he was the one who had complained to Ms. Fan; fearing retaliation, Plaintiff denied filing a complaint. Oluka Decl. ¶ 9. At that time, Mr. Ford told Plaintiff that he "had ordered Ms. Mendoza to write the December 2003 Disciplinary Notice for possible use when needed." Oluka Decl. ¶ 9. On January 26, 2004, Plaintiff was again written up by Ms. Mendoza, who stated that she and Plaintiff had argued, culminating in Plaintiff yelling at her, raising his hands and threatening to "tare [sic] me apart." Levy Decl., Ex. B, January 26, 2004, Interoffice Memorandum from Ms. Mendoza to Mr. Ford. Plaintiff denies that he argued with or threatened Ms. Mendoza. Oluka Dep. 297:8-16. Mr. Ford was called to the site, and he told Ms. Mendoza that he had been having "issues" with Plaintiff. Mendoza Dep. 142:6-12. Mr. Ford ordered Plaintiff to turn over his badge and escorted him out of the building. Id. 302:8-16.

On January 26, 2004, the day after Plaintiff was removed by Mr. Ford, K.F. went to the Guardsmark office and admitted to Ms. Fan that she had been harassed by Mr. Ford. Levy Decl., Ex. A, February 6, 2006 Memo from Emily Fan and Luis Estrera to Donna Smith. The investigation of Mr. Ford was reopened. K.F.'s

8

attorney sent a letter to Guardsmark, which caused Ms. Fan to suspend Mr. Ford on February 5, 2006. Fan Dep. 185:1-14. Mr. Ford retired from Guardsmark in March, 2004, before the investigation into K.F.'s allegations was complete. Id. 270:10-16.

Meanwhile, Ms. Fan told Plaintiff that there "appears to be a misunderstanding," and that he might be able to return to the 560 Mission Street site "after the allegations of sexual harassment are concluded." Oluka Dep. 306:13-18. Ms. Fan explained to him that "by educated guesswork, they may have discovered that I spoke to her about the sexual harassment." Id. 307:7-9. After Plaintiff's removal from the 560 Mission Street site, he continued to work eight hours per week for Guardsmark at the Dolby Labs site, where he had worked part time since fall, 2003. Oluka Decl. ¶ 12. February 27, 2004 was Plaintiff's last day at Dolby Labs, because the person for whom he had been substituting returned from vacation. Id. ¶ 13. Plaintiff worked for another security company that paid less in order to make up for the hours he had lost at Guardsmark. Id. ¶ 15. On March 16, 2004, Plaintiff reminded Mr. Estrera that he lacked work, and Mr. Estrera suggested that Plaintiff submit a request for pay in lieu of vacation "to ease the financial burden," which Plaintiff did. Id. ¶ 16. Mr. Estrera disputes Plaintiff's account, stating that he offered Plaintiff a full-time position elsewhere, which Plaintiff turned down "because he was planning to take vacation and did not want to accept or train for any new assignment until he returned from vacation." Estrera Decl. ¶ 11. On March 17, 2004, Marjorie Saenz, the Account Manager for the Dolby Labs site, offered Plaintiff another

temporary, full-time job at Dolby Labs, again as a substitute for someone who was going on vacation, for sometime in April, but she did not know when.   Oluka Decl. ¶ 17.   Plaintiff does not dispute that he did not accept this assignment.

On April 4, 2004, Plaintiff wrote to Mr. Estrera and Ms. Fan and complained that, after the disciplinary incident with Ms. Mendoza,

> I was then reduced to working eight (8) hours a week till the end of February on another post from my average of 58 hours a week.  That reduction in work hours has cost me not less than $5,000 in the past eight weeks.  I had considered being 'employed' for eight (8) hours a week as making a mockery of my job until you informed me during our meeting that I will be returned to my position as soon as your investigations in to allegations of sexual harassment in the building are concluded.  I am still waiting to see any genuine efforts to return me to my post.  The eight hours a week that I was working was a temporary relief shift that was previously scheduled to last for four weeks as overtime.

Oluka Decl., Ex. F, April 5, 2004 Letter From Plaintiff to Mr. Estrera and Ms. Fan.  On April 14, 2004, Donna Smith, a Guardsmark Vice President at its corporate office in Tennessee, responded to Plaintiff acknowledging receipt of his letter and stating,

> We are giving the concerns you raised a fresh look and are re-evaluating the circumstances surrounding the December 29, 2003 disciplinary action and those following your notification of alleged sexual harassment.  The branch has been requested to provide relevant information to me for review.
> You remain an employee in good standing, and we are anxious to return you to work as soon as you are ready.  You should contact Emily Fan to discuss available openings.
> I will be out of the office next week and would request that should you have additional questions, that you direct them to Emily Fan in my absence.  I would anticipate that we will have a full written response to you by month end.

Oluka Decl., Ex. E, April 14, 2004 Letter from Ms. Smith to Plaintiff.  Plaintiff never received any further response from Ms. Smith.  Oluka Decl. ¶ 18.  According to Ms. Mendoza, no one talked

10

1  to her about the disciplinary incident at any point between January

2  26 and mid-April, 2004.  Mendoza Dep. 126:1-6.

3                              LEGAL STANDARD

4      Summary judgment is properly granted when no genuine and

5  disputed issues of material fact remain, and when, viewing the

6  evidence most favorably to the non-moving party, the movant is

7  clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

8  56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

9  Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

10  1987).

11     The moving party bears the burden of showing that there is no

12  material factual dispute.  Therefore, the court must regard as true

13  the opposing party's evidence, if supported by affidavits or other

14  evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815

15  F.2d at 1289.  The court must draw all reasonable inferences in

16  favor of the party against whom summary judgment is sought.

17  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

18  587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d

19  1551, 1558 (9th Cir. 1991).

20     Material facts which would preclude entry of summary judgment

21  are those which, under applicable substantive law, may affect the

22  outcome of the case.  The substantive law will identify which facts

23  are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

24  (1986).

25     Where the moving party does not bear the burden of proof on an

26  issue at trial, the moving party may discharge its burden of

27  production by either of two methods.  Nissan Fire & Marine Ins.

28                                    11

United States District Court

For the Northern District of California

<u>Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Id.</u>

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. <u>Id.</u>; <u>see also Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. <u>Nissan</u>, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no

United States District Court

For the Northern District of California

12

1   obligation to offer any evidence in support of its opposition.  Id.

2   This is true even though the non-moving party bears the ultimate

3   burden of persuasion at trial.  Id. at 1107.

4                           DISCUSSION

5   I.  Retaliation Claim

6       Defendants move for summary adjudication of Plaintiff's claim

7   for retaliation on the grounds that Plaintiff (1) cannot establish

8   that Guardsmark or Mr. Ford took any adverse employment action

9   against him and (2) cannot show a connection between his alleged

10  protected activities and any alleged adverse employment action.

11      California Government Code § 12940(h) forbids employers from

12  retaliating against employees who have acted to protect the rights

13  afforded by the California Fair Employment and Housing Act (FEHA),

14  Government Code § 12900 et. seq.  In order to establish a prima

15  facie case of retaliation, a plaintiff must show that he or she

16  (1) engaged in a protected activity, (2) the employer thereafter

17  subjected him or her to adverse employment action, and (3) there

18  was a causal link between the protected activity and the adverse

19  employment action.  Mathieu v. Norrell Corp., 115 Cal. App. 4th

20  1174, 1185 (2004) (citing Soldinger v. Northwest Airlines, Inc., 51

21  Cal. App. 4th 345, 367 (1996)); see also Brooks v. City of San

22  Mateo, 229 F.3d 917, 928 (9th Cir. 2000).

23      A.  Adverse Employment Action

24      The California Supreme Court has recently held that

25      the proper standard for defining an adverse employment action
        is the 'materiality' test, a standard that requires an
26      employer's adverse action to materially affect the terms and
        conditions of employment, rather than the arguably broader
27      'deterrence' test.

28                                  13

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

<u>Yanowitz v. L'Oreal USA, Inc.</u>, 36 Cal. 4th 1028, 1036 (2005)
(internal citation omitted).  However, the court made clear that
the "'terms, conditions, or privileges' of employment must be
interpreted liberally and with a reasonable appreciation of the
realities of the workplace."  <u>Id.</u> at 1054.  Any adverse treatment
"that is reasonably likely to impair a reasonable employee's job
performance or prospects for advancement or promotion falls within
reach" of California anti-discrimination law.  <u>Id.</u>  An employer's
alleged retaliatory acts are to be considered collectively, and
need not separately constitute adverse employment action.  <u>Id.</u> at
1055-56.  "Retaliation claims are inherently fact specific, and the
impact of an employer's action in a particular case must be
evaluated in context."  <u>Id.</u> at 1052.  Therefore, the determination
of whether an employer's acts rise to the level of actionable
conduct must "take into account the unique circumstances of the
affected employee as well as the workplace context of the claim."
<u>Id.</u>

Applying the law as set forth in <u>Yanowitz</u>, the Court finds
that Plaintiff has shown evidence sufficient to raise a dispute of
fact as to whether Guardsmark and Mr. Ford subjected him to adverse
employment action by repeatedly denying his requests to transfer to
a swing shift position, removing him from his full-time position at
560 Mission Street and issuing false disciplinary reports against
him.  Guardsmark's analysis improperly describes certain acts in
isolation, and relies on testimony by Mr. Estrera that was
contradicted by Plaintiff.  Mr. Ford's assertion that he "merely"
sent Plaintiff home for the evening and submitted a written report

14

United States District Court

For the Northern District of California

of the disciplinary incident with Ms. Mendoza likewise both minimizes the significance of those acts, which together may have materially impacted the terms and conditions of Plaintiff's employment, and ignores Plaintiff's other allegations, such as that Mr. Ford caused Plaintiff to be unfairly disciplined.  Defendants' request that the Court disregard certain of Plaintiff's allegations as beyond the scope of his Complaint is not well taken.  The allegations contained in the Complaint were sufficient to notify Defendants of the basis of Plaintiff's present claims against them.  See, e.g., Complaint ¶ 35 (alleging that Defendants retaliated against Plaintiff by reducing his hours to eight per week).  Therefore, Defendants' motions for summary adjudication of this portion of Plaintiff's prima facie case are denied.

B.   Protected Activity and Causal Connection

In addition to showing an adverse employment action, a plaintiff must also show the existence of a causal connection between the adverse employment action and protected activities.  In order to qualify as protected activities, an employee need not use "legal terms or buzzwords when opposing discrimination.  The court will find opposing activity if the employee's comments, when read in their totality, oppose discrimination."  Yanowitz, 36 Cal. 4th at 1047 (quoting Wirtz v. Kansas Farm Bureau Servs., Inc., 274 F. Supp. 2d 1198, 1212 (D. Kan. 2003)).

> Standing alone, an employee's unarticulated belief that an
> employer is engaging in discrimination will not suffice to
> establish protected conduct for the purposes of establishing a
> prima facie case of retaliation, where there is no evidence
> the employer knew that the employee's opposition was based
> upon a reasonable belief that the employer was engaging in
> discrimination.  Although an employee need not formally file a

15

United States District Court

For the Northern District of California

1
2
3
4

charge in order to qualify as being engaged in protected
opposing activity, such activity must oppose activity the
employee reasonably believes constitutes unlawful
discrimination, and complaints about personal grievances or
vague or conclusory remarks that fail to put an employer on
notice as to what conduct it should investigate will not
suffice to establish protected conduct.

5    Id. at 1046-47 (internal citations omitted).

6        A causal connection between protected activities and adverse

7    employment actions may be established "with evidence that the

8    employer was aware of the protected activities and the adverse

9    actions followed each within a relatively short time." Cal. Fair

10   Housing and Employment Comm'n v. Gemini Aluminum Corp., 122 Cal.

11   App. 4th 1004, 1020 (2004).

12       Plaintiff identifies as alleged protected activities his

13   February 10, 2003 letter to Mr. Ford, his December, 2003 request

14   for an urgent meeting with Ms. Fan and the allegations disclosed in

15   his January, 2004 meeting with Ms. Fan.

16       Defendants argue that the first two incidents are irrelevant

17   for the purposes of establishing a causal connection because they

18   do not constitute "protected activity." They argue that

19   Plaintiff's February 10, 2003 letter cannot be interpreted as

20   opposing discrimination because, at that time, Plaintiff did not

21   know that Mr. Ford had sexually assaulted K.F., and in fact

22   asserted that such rumors were "unsubstantiated." However,

23   Plaintiff could reasonably have believed that the rumors regarding

24   Mr. Ford's preferences for African-Americans and women resulted in

25   a hostile or discriminatory work environment towards those

26   employees; indeed, Plaintiff clearly stated that his co-worker's

27   unchecked rumors were creating a "disruptive and hostile

28                                       16

United States District Court

For the Northern District of California

environment for us as we perform our duties." Plaintiff's letter opposes conditions implicating his employer that are not analogous to a co-worker's single derogatory remark, which courts have held is not sufficient to support a prima facie case for retaliation. See Silver v. KCA, Inc., 586 F.2d 138, 142 (9th Cir. 1978) (holding that opposition of an employee to a co-worker's racially derogatory remark was not protected by Title VII); Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959-60 (11th Cir. 1997) (following Silver and holding that opposition to racial remark by co-worker was not protected activity). The fact that Plaintiff was not apprised of the true facts at the time he wrote his first letter does not mean that the letter was not protected.

Plaintiff's December, 2003 request for a meeting with Ms. Fan for unspecified, urgent reasons is not, in itself, protected activity, sufficient to support Plaintiff's retaliation claim against Guardsmark. However, Plaintiff may be able to prove at trial that Mr. Ford knew that Plaintiff had taken steps to report K.F.'s sexual harassment and assault to Ms. Fan. In light of evidence such as Mr. Ford's alleged questions to K.F. about Plaintiff, Mr. Ford's alleged orders that any shift change request from Plaintiff be denied and alleged preparation of an earlier false disciplinary report, a triable question of fact exists as to the extent of Mr. Ford's awareness of Plaintiff's involvement and whether Mr. Ford took adverse action against Plaintiff both as a result of, and in anticipation of, his complaints.

With respect to Plaintiff's alleged removal from the 560 Mission Street site and accompanying reduction in hours and pay,

17

Plaintiff has shown both a temporal connection as well as direct evidence of a causal link, namely Plaintiff's testimony that Ms. Fan told him he might be allowed to return to work at the 560 Mission Street site once the investigation into his allegations of sexual harassment concluded.

For these reasons, Defendants' motions for summary adjudication of this portion of Plaintiff's prima facie case are denied.

C.   Pretext

In their reply, Defendants assert that Guardsmark articulated a legitimate, non-discriminatory reason for removing Plaintiff from the 560 Mission Street site, and that Plaintiff has failed to raise a dispute of fact as to pretext.   The Court finds that Plaintiff has shown evidence of pretext, such as the alleged failure to investigate the claimed disciplinary incident with Ms. Mendoza and Plaintiff's statement that Mr. Ford told him that he had ordered preparation of the earlier false disciplinary report.

Therefore, the Court denies Defendants' motions for summary adjudication of Plaintiff's claim for retaliation.

II.   Mr. Ford's Liability

Mr. Ford moves for summary adjudication of Plaintiff's retaliation claim on the grounds that he cannot be held individually liable for personnel decisions made in his capacity as Plaintiff's supervisor.

Defendants argue that California courts have not yet settled whether a supervisor may be held personally liable for a claim of retaliation under FEHA, and urge the Court to apply the reasoning

18

United States District Court

For the Northern District of California

in Reno v. Baird, 18 Cal. 4th 640 (1998), where the California Supreme Court held that plaintiffs bringing a claim of discrimination under FEHA or a claim of wrongful discharge in violation of public policy could sue and hold liable their employers, but not their individual supervisors.  However, courts that have considered this question have refused to apply Reno to retaliation claims, distinguishing the law at issue in Reno from "the statutory language regarding retaliation and the reference to 'person' indicating a legislative intent to allow individual liability for retaliatory acts by supervisors." Walrath v. Sprinkel, 99 Cal. App. 4th 1237, 1242 (2002) (counting cases); see, e.g, Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1288 (9th Cir. 2001) (distinguishing Reno and holding that supervisors can be held liable for retaliation under FEHA). Nothing in these decisions suggests that their holdings should be limited to situations in which retaliation is intertwined with discriminatory harassment.  Plaintiff has shown evidence from which a reasonable jury could infer that Mr. Ford took adverse action against Plaintiff based on a retaliatory motive.  Therefore, the Court denies Mr. Ford's motion for summary adjudication on this ground.

III.  Disability Claim

        Guardsmark moves for summary adjudication of Plaintiff's claim against it for violation of FEHA based on a failure to engage in an interactive process regarding his alleged sleep disorder, on the grounds that Plaintiff has failed to show evidence (1) that he had

a disability as defined by FEHA; (2) that Guardsmark knew of the

disability; or (3) that he requested reasonable accommodation for

that disability.

A.   Applicable Law

California Government Code § 12940(n) makes it unlawful

> For an employer or other entity covered by this part to fail
> to engage in a timely, good faith, interactive process with
> the employee or applicant to determine effective reasonable
> accommodations, if any, in response to a request for
> reasonable accommodation by an employee or applicant with a
> known physical or mental disability or known medical condition.

The law "contains broad definitions of physical disability, mental

disability, and medical condition."  Cal. Govt. Code § 12926.1(b).

A "physical disability" is defined to include, "but is not limited

to":

> Having any physiological disease, disorder, condition,
> cosmetic disfigurement, or anatomical loss that does both of
> the following:
>    (A) Affects one or more of the following body systems:
>    neurological, immunological, musculoskeletal, special
>    sense organs, respiratory, including speech organs,
>    cardiovascular, reproductive, digestive, genitourinary,
>    hemic and lymphatic, skin, and endocrine.
>    (B) Limits a major life activity . . . .

Cal. Gov. Code § 12926(k)(1).  The Ninth Circuit has concluded that

sleeping is a major life activity.  McAlindin v. County of San

Diego, 192 F.3d 1226, 1233 (9th Cir. 1999).

An employer's obligation to engage in an interactive process

is triggered when an employee "gives the employer notice of the

employee's disability and the desire for a reasonable

accommodation."  Williams v. Genentech, Inc., 139 Cal. App. 4th

357, 381 (2006) (citing Jensen v. Wells Fargo Banks, 85 Cal. App.

4th 245, 261 (2000)).  An employee need not "speak any magic words"

20

in order to request accommodation.  <u>Prilliman v. United Airlines,</u>
<u>Inc.</u>, 53 Cal. App. 4th 935, 954 (1997) (quoting <u>Schmidt v. Safeway,</u>
<u>Inc.</u>, 864 F. Supp. 991, 997 (D. Or. 1994)).  However, an employee
must demonstrate that his or her "injury or physical condition
. . . makes 'difficult' the achievement of work or some other major
life activity."  <u>Gelfo v. Lockheed Martin Corp.</u>, 140 Cal. App. 4th
34, 47 (2006).  Although an employer's knowledge of the employee's
disability can be inferred from circumstances, knowledge "will only
be imputed to the employer when the fact of disability is the only
reasonable interpretation of the known facts."  <u>Brundage v. Hahn</u>,
57 Cal. App. 4th 228, 237 (1997).

    B.  Analysis

    In his January 4, 2004 letter, Plaintiff explicitly notified
his employer that he was experiencing severe sleeping problems as a
result of the graveyard shift, including instances where he could
not sleep for up to forty-eight hours.  Plaintiff requested
transfer to a swing shift.  Plaintiff received no response to his
letter.

    Defendants maintain that, as a matter of law, a sleeping
disorder caused by shift work does not constitute a disability.  In
<u>Baulos v. Broadway Express, Inc.</u>, 139 F.3d 1147, 1153 (7th Cir.
1998), the Seventh Circuit held that an "inability to drive sleeper
trucks because of sleep deprivation" was not an "impairment that
substantially limits the major life activity of working," as
defined by the Americans with Disabilities Act (ADA), in part
because the plaintiffs' complaints of sleep deprivation were common
among truck drivers assigned to sleeper truck duty.  <u>See also</u>

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  <u>Williams v. City of Charlotte, N.C.</u>, 899 F. Supp. 1484, 1488 (D.C.

2  N.C. 1995) (holding that alleged "shift work sleep disorder"

3  experienced by the "overwhelming majority" of night shift workers

4  was not a disability under the ADA); <u>Mont-Ros v. City of West</u>

5  <u>Miami</u>, 111 F. Supp. 2d 1338, 1356 (D.C. Fla. 2000) (finding that

6  plaintiff with sleep apnea failed to show that his condition

7  substantially limited a major life activity as required by the

8  ADA).   However, all of the cases cited by Defendants rely on the

9  ADA's definition of disability:  an impairment that "<u>substantially</u>

10 <u>limits</u>" a major life activity.  42 U.S.C. § 12102(2)(A) (emphasis

11 added).   FEHA's definition of disability is broader and includes

12 any impairment that "limits" or "makes 'difficult'" a major life

13 activity.  Government Code § 12926(k)(1)(B); <u>Gelfo</u>, 140 Cal. App.

14 4th at 47.  As the California legislature has clarified,

15     the definitions of 'physical disability' and 'mental
       disability' under the law of this state require a 'limitation'
16     upon a major life activity, but do not require, as does the
       Americans with Disabilities Act of 1990, a 'substantial
17     limitation.'  This distinction is intended to result in
       broader coverage under the law of this state than under that
18     federal act.

19 Cal. Govt. Code § 12926.1(c).  Furthermore, unlike in <u>Baulos</u> and

20 <u>Williams</u>, here there is no evidence that Plaintiff's impairment,

21 which sometimes involved being unable to sleep for forty-eight

22 hours in a row, was a common condition suffered by most graveyard

23 shift workers.  Defendants offer no legal authority for their

24 argument that Plaintiff cannot prove disability on the basis of his

25 own self-reporting, and no factual support for their assertion that

26 Dr. Savage concluded that Plaintiff's inability to sleep was not a

27 "physiological condition."  Therefore, the Court cannot decide as a

28

United States District Court

For the Northern District of California

matter of law that Plaintiff was not disabled under FEHA.

Likewise, the Court denies Defendants' request for summary adjudication that, because Plaintiff did not have a disability or provide Guardsmark with a physician's note, he cannot have given Guardsmark legally sufficient notice of his disability. Plaintiff did not need to invoke any "magic words" in order to trigger Defendants' obligations under FEHA, and Defendants have offered no reasonable interpretation of the facts Plaintiff presented in his letter other than that he had a physiological impairment that limited his ability to sleep. The fact that Plaintiff thought that his impairment was caused by working the graveyard shift and might be alleviated by a transfer does not necessarily mean that Plaintiff's condition was not "physiological" in nature. Although Guardsmark was entitled to inquire into Plaintiff's ability to perform job-related functions and to respond to Plaintiff's request for accommodation, California Government Code § 12940(e)(2), it did not do so.

Therefore, the Court denies Guardsmark's motion for summary adjudication of Plaintiff's disability claim.

CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motions for summary adjudication of Plaintiff's defamation claim but otherwise DENIES the motions for summary judgment (Docket No. 60).

IT IS SO ORDERED.

Dated: 9/26/06

_____
CLAUDIA WILKEN
United States District Judge

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court

For the Northern District of California